## 47846. WEST GEORGIA PULPWOOD & TIMBER COMPANY v. STEPHENS.

CLARK, Judge. "Our strategy boomeranged!" These sad words of lamentation have often been expressed by lawyers when their filing of a suit has produced a counterclaim by defendant. Their sorrow has in many instances been compounded when such commencement of litigation produced a further unforeseen development in that the jury's verdict was not only adverse to the initial claim but was for a substantial amount in defendant's favor on the cross action. See *General Tire &c. Co. v. Brown Tire Co., Inc.,* 46 Ga. App. 548 (168 SE 75). Such an occurrence exists here. Plaintiff, referred to hereafter as West Georgia, sued Stephens, who will be herein referred to by name, for breach of contract to which Stephens filed his answer in which he not only denied any breach but included as a part thereof a tort counterclaim praying

for actual damages, punitive damages, and attorney fees against West Georgia. The jury's verdict for Stephens did not segregate damages but read for the lump "sum of $17,500 plus lawyers fees, the sum of $2,500" on his counterclaim.

This litigation arose out of an oral agreement for the purchase, raising and selling of hogs.[1] The contract was to extend one year commencing September 1970. West Georgia agreed to provide $1,500 monthly to Stephens which he was to use to buy feeder pigs (originally weighing 40 to 50 pounds) to raise on his farm during their grow-out period of 120 days at which time he was to sell them as hogs (weight 200 to 220 pounds) at the then going rate, with Stephens to receive 2 1/2 cents per pound of weight gain per animal. He was also to receive a $5 commission on each ton of feed which was paid for by West Georgia, the final profit or loss to belong to West Georgia. Other factors were claimed by Stephens to be included, such as adverse weather, availability of pigs, and changes in the market price of both feeder pigs and full grown hogs. After making four monthly payments totalling $6,000 West Georgia called upon Stephens for an accounting in January, that being the date of the normal grow-out period for the feeder pigs purchased in September. In his written statement provided on March 31, 1971, to West Georgia, it was shown that Stephens had bought 162 pigs for which he expended $1,955, had sold 21 of these

---

[1]It is only by coincidence that under our court's rotation of assignments it should become the lot of a Hebrew judge to write this opinion dealing with pigs since orthodox Hebrews are forbidden to eat porcine products under the Mosaic edicts, which make ham, bacon, and pork *trayf* (not kosher).

porkers for $794 ($32.81 per animal) and was holding 125 animals and a monetary balance of $4,839.40. The remainder of the pigs had died or been used by Stephens to make sausage. West Georgia expressed dissatisfaction with this result and contended Stephens had breached the contract. They asked for their hogs and the balance of the funds. Thereupon Stephens informed West Georgia's representative he would pay "whenever he could" which proposal Stephens regarded as a "settling off" figure. West Georgia's representative immediately proceeded on that same date to join with other individuals for whom Stephens was raising feeder pigs and jointly sought a possessory warrant from a justice of the peace.

The cross action was based upon the allegedly illegal manner in which this possessory warrant proceeding was handled by West Georgia. Using the archaic language which is codified as § 82-101 from the Acts of 1821, the pertinent portions of the printed form of the affidavit read: "On the 31 day of March 1971, 663 pigs value $11,682.50 having been recently in the quiet, peaceable and legally acquired possession of deponent, was taken and carried away from the possession of deponent, without his consent, by fraud, violence, seduction or other means; and as deponent believes, has been harbored, received or taken possession of by V. R. Stephens of said county, under certain pretended claim or claims, without lawful warrant or authority; and deponent bona fide claims a legal ownership and rightful possession of said property above described." That possessory warrant was executed the same evening at which time all the hogs were counted by a livestock dealer under the supervision of the deputies. There is some dispute as to the number of hogs removed that evening with the remainder some 1 1/2 weeks later, Stephens claiming 439 were counted. The evidence of the livestock dealer showed he purchased

366 hogs for which he paid plaintiff and two other parties who owned the remaining hogs a flat price of $17.50 for each animal. West Georgia received $2,537.50 representing the purchase price for 145 hogs for which it gave credit to Stephens when this suit was filed for the balance owing West Georgia. (The discrepancy in numbers results in part by reason of animals belonging to other parties being included in the possessory warrant.)

In his cross action Stephens claimed the hogs sold to the livestock dealer had a value considerably in excess of the average purchase price of $17.50 and that included among the hogs seized by the court official at West Georgia's direction were 74 belonging to him personally. He also sought recovery for other expenses such as spraying, vaccination, hauling and castration as well as feed expense for the month of March. These actual damages were averred as amounting to $7,155.71.

Nothing further was done on the possessory warrant either by West Georgia or by Stephens to comply with the provisions of Ch. 82-2 of our Code, such as posting bond or having a J. P. hearing. West Georgia contended it had acted properly since the justice of peace had not required a bond and Stephens had not asked for a. hearing. Stephens argued that the possessory warrant was used illegally not only in that there were no proper grounds for its issuance but that it was used to "extort" 74 hogs belonging to Stephens as well as to obtain more money than West Georgia was entitled to "in that the court official was directed to take all of the hogs." Additionally, that the private sale without notice to Stephens at $17.50 flat per animal was for an inadequate price.

West Georgia moved for a directed verdict against the counterclaim. Errors in the denial of this motion as well as in the overruling of an amended new trial

motion are argued in this appeal. *Held:*

1. We must first determine if the evidence here presents a claim for "malicious use of process" or one for "malicious abuse of process." In his excellent dissertation on these subjects in 1 Encyc. of Georgia Law, Arnold Shulman states at page 119 one of the differences between these to be that "Generally, malicious use of legal process implies an ulterior motive in procuring the issuance of process, whereas abuse of legal process involves an improper use after its issuance." Appellant argues this case to be one for malicious use. If so, then it would be incumbent upon Stephens to show a successful termination of the previous litigation. *Myers v. Clark,* 126 Ga. App. 154 (2) (190 SE2d 134); *Ga. Veneer &c. Co. v. Florida Nat. Bank,* 198 Ga. 591 (32 SE2d 465). Such prerequisite of a successful termination does not exist in an action for malicious abuse of process. *King v. Yarbray,* 136 Ga. 212 (71 SE 131); *Collier v. Buice,* 36 Ga. App. 198 (2) (136 SE 287). This then leaves for our consideration that "The two major elements involved in an action for abuse of process are the existence of an ulterior purpose and an act in the use of the process not proper in the regular prosecution of the proceedings." 1 Encyc. of Ga. L., p. 120. As the trial transcript shows the evidence here was sufficient to create a jury issue as to the existence of these elements, we rule the trial judge to have been correct in denying West Georgia's motion for directed verdict upon the counterclaim.

2. In addition to the necessity of showing an ulterior purpose the distinctive nature of an action for malicious abuse of process is that it lies for the improper use of process *after* it has been issued. *Ellis v. Millen Hotel Co.,* 192 Ga. 66, 69 (14 SE2d 565). See also *Mullins v. Matthews,* 122 Ga. 286 (50 SE 101) and *Brantley v. Rhodes-Haverty Furniture Co.,* 131 Ga. 276, 281 (62 SE 222). On the basis of the testimony

presented in the trial court the jury could and did determine that West Georgia's conduct in directing the levy to be made upon *all* of the hogs on the farm, including those personally owned by Stephens, followed by the immediate private sale at a fixed price of $17.50 per hog regardless of weight differences, were illegal actions "after" issuance of process. As such they were aimed at obtaining a collateral advantage, namely forcing Stephens to pay instanter the debt he had that same day agreed to pay "whenever he could." The jury thus had the right to decide that West Georgia " 'wilfully misapplied or perverted [it] to some use which the law did not intend such a process should subserve.' [Cits.]" *Schroeder v. Bennett,* 43 Ga. App. 389, 390 (159 SE 121); *Dugas v. Darden,* 65 Ga. App. 394, 396 (15 SE2d 901). See also Prosser, Law of Torts (2d Ed.) page 669.

"It must be remembered that the jury are the sole judges of the credibility of the witnesses, and clothed with this authority, they were authorized to believe those witnesses whom they thought most entitled to be believed." *White v. State,* 74 Ga. App. 634, 636 (40 SE2d 782). " 'After the verdict, the testimony is construed in its most favorable light to the prevailing party . . . for every presumption and inference is in favor of the verdict.' [Cit.]" *Stapleton v. Amerson,* 96 Ga. App. 471 (5a) (100 SE2d 628). Enumerations 2 and 3 are therefore without merit.

3. Enumeration number 4 contends the verdict was illegal in that (a) it did not itemize actual damages and punitive damages but read for a lump "sum of $17,500 Dollars plus lawyers fees, the sum of $2,500," and (b) there is not shown that the jury found any amount for actual damages, which is a necessary condition precedent to awarding punitive damages. See *Kilgore v. Nat. Life &c. Co.,* 110 Ga. App. 280 (1) (138 SE2d 397). "Verdicts shall have a reasonable intendment, and

shall receive a reasonable construction, and shall not be avoided unless from necessity." Code Ann. § 110-105. "The verdict may be construed in the light of the pleadings, the issues made by the evidence and the charge. [Cits.] . . . The presumptions are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. [Cit.] Even if the verdict is ambiguous . . . and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied. [Cit.]" *Haughton v. Judsen,* 116 Ga. App. 308, 310 (157 SE2d 297). As a minimum, actual damages were shown by Stephens having lost his personal hogs. Although there was no itemization as between general damages and punitive damages here "The verdict . . . did not . . . include in its original form any element of recovery unwarranted by the evidence." *Hughes v. Bivins,* 31 Ga. App. 198 (6) (121 SE 590). It was therefore not illegal as such. Furthermore, if the form of the verdict was improper, it was incumbent upon West Georgia to make its objections as to irregularity of form at the time of its rendition or otherwise such technicality is waived. *Golosky v. Whorle,* 117 Ga. App. 335 (160 SE2d 614). This is so because a verdict may be reformed or remodeled in the presence of the jury before they have retired from the box. *Herndon v. Sims,* 7 Ga. App. 675 (3) (67 SE 835). See also *Ga. R. &c. Co. v. Tompkins,* 138 Ga. 596, 603 (75 SE 664).

4. Enumeration number 5 contends the verdict is excessive. "The question of damages being one for the jury, the court should not interfere, unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias." Code § 105-2015. See also *Kiker v. Davis,* 103 Ga. App. 289, 290 (118 SE2d 861). " 'Before the verdict will be set aside on the ground that it is excessive, where there is no

direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear "exhorbitant," "flagrantly outrageous," and "extravagant" . . . It must carry its death warrant upon its face.' [Cits.]" *St. Paul Fire &c. Ins. Co. v. Dillingham,* 112 Ga. App. 422, 424 (145 SE2d 624). The bias or prejudice that resulted in such a verdict must be manifest in the record. In accord, *Colonial Stores v. Coker,* 77 Ga. App. 227 (9) (48 SE2d 150). No such prejudice appears from the record in the instant case. " 'When a case comes before this court, after the refusal of a new trial by the presiding judge, it comes not only with the presumption in favor of the verdict, but also stamped with the approval of the judge who tried the case, and where no prejudice or bias or corrupt means in reaching the verdict appear, we are not authorized to set it aside as being excessive.' [Cits.]" *Yale & Towne v. Sharpe,* 118 Ga. App. 480, 492 (164 SE2d 318). See also *Jones v. Spindel,* 128 Ga. App. 88 (196 SE2d 22) and citations therein. This enumeration is therefore without merit.

5. Enumeration number 6 contends that the trial court erred in refusing to permit cross examination of Stephens concerning terms of agreements he had with others for raising pigs. Generally, such other transactions are inadmissible because irrelevant. See *G. E. C. Corp. v. Levy,* 126 Ga. App. 604 (6) (191 SE2d 461), and cases therein cited. Furthermore, we must recognize that "Although evidence of collateral matters may throw some remote light on the main issues of the cases, it is nevertheless necessary that trial judges be vested with some discretion as to the admissibility of this type of evidence." *Ludwig v. J. J. Newberry Co.,* 78 Ga. App. 871, 876 (52 SE2d 485). In concluding his colloquy with counsel on this point, the trial judge made this appropriate pithy comment: "Let's keep the pigs in these pens." This court affirms

his decision.

*Judgment affirmed. Hall, P. J., concurs. Evans, J., concurs specially.*

SUBMITTED JANUARY 8, 1973—DECIDED APRIL 2, 1973—
REHEARING DENIED APRIL 24, 1973.

*Kendrick W. Mattox, Jr., Hansell, Post, Brandon & Dorsey, Dent Acree,* for appellant.

*Richter & Birdsong, A. W. Birdsong, Jr.,* for appellee.

EVANS, Judge, concurring specially. 1. The majority opinion sets forth a footnote with reckless disregard for relevancy to the facts and the law in the case under consideration. Therefore, while I do not approve of footnotes, I feel impelled to respond to that footnote with a quasi-footnote as follows, to wit:

> " 'The time has come,' the walrus said
> 'To talk of many things —
> Of shoes — and ships — and sealing wax,
> Of cabbages and kings;
> And why the sea is boiling hot
> And whether pigs have wings.' "

As to relevancy, both the author of the majority footnote and that of "Alice Through the Looking Glass" in the quasi-footnote, seem to have striven for irrelevancy, with much success.

2. I concur in the judgment in this case only.